**DE CASTRO v. BOARD OF COM'RS OF SAN JUAN.**

No. 3796.

Circuit Court of Appeals, First Circuit.

June 14, 1943.

Hugh R. Francis and Gabriel de la Haba, both of San Juan, Puerto Rico, for appellant.

F. Fernandez Cuyar and H. Gonzales Blanes, both of San Juan, Puerto Rico, for appellee.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

On January 4, 1937, the Board of Commissioners of San Juan (the newly elected members of which took office on that day) appointed Carlos M. de Castro, appellant herein, as city manager of the Capital of Puerto Rico. Pursuant to § 22 of Act No. 99, Laws of Puerto Rico (1931) pp. 638-640, the said Board of Commissioners, after hearing upon charges, removed de Castro from office on April 5, 1939. The District Court of San Juan upheld the Board. On appeal the Supreme Court of Puerto Rico reversed the judgment of the district court and directed appellant's reinstatement. The Supreme Court's judgment which was rendered June 28, 1940, read as follows: "For the reasons set forth in the foregoing opinion, the judgment appealed from, which was rendered by the District Court of San

Juan on August 21, 1939, is hereby reversed, and in its stead a new one rendered, annulling Ordinances No. 370, of January 5, 1939, and No. 373, of April 5, 1939, which decreed the suspension and removal of the city manager, and in consequence thereof, ordering the reinstatement of the petitioner Carlos M. de Castro in his office of city manager, said reinstatement to date back from January 5, 1939, when the petitioner was suspended from office and pay."

An appeal was duly allowed, and on July 30, 1940, the court below approved a supersedeas bond. This court affirmed the judgment of the Supreme Court of Puerto Rico on January 10, 1941. Board of Commissioners of San Juan v. De Castro, 1 Cir., 116 F.2d 806. Certiorari was denied on October 13, 1941, 314 U.S. 614, 62 S.Ct. 61, 86 L.Ed. 495.

Shortly after our mandate went down to the Supreme Court of Puerto Rico the Board, on October 27, 1941, filed in that court a motion to stay the execution of its judgment of June 28, 1940 (which we had affirmed) insofar as it ordered the reinstatement of appellant, on the ground that meanwhile appellant's term of office as city manager had expired.

Appellant filed an opposition to this motion, and after a hearing thereon, the Supreme Court of Puerto Rico on January 14, 1942, entered its judgment, from which the present appeal is taken reading as follows: "For the reasons set forth in the foregoing opinion, the motion filed by the Board of Commissioners of San Juan on October 27, 1941, is granted, and in consequence thereof the execution of the judgment of this court of June 28, 1940, is stayed insofar as it decrees the reinstatement of petitioner Dr. Carlos M. de Castro in the office of city manager of the capital because the term for which he was appointed expired in February, 1941."

If the court below was correct in its conclusion that appellant's term of office expired at some time subsequent to its judgment of June 28, 1940, ordering appellant's reinstatement, we think it is mani-

fest that that court had jurisdiction to stay the execution of its judgment insofar as it decreed reinstatement, despite the fact that the said judgment had been affirmed by this court. See Puerto Rican Code of Civil Procedure, § 7, subdivision 8. Appellant urges that the issue as to his tenure of office had become res judicata in his favor, because in his brief before the Supreme Court of Puerto Rico at the earlier hearing he had advanced the contention that the city manager holds office during good behavior. But that court in its opinion of June 28, 1940, did not go into the question of the tenure of the office at all, and did not need to, because at that time appellant's four-year term, which the Board claims was the extent of his tenure, had not expired. Certainly, when we affirmed on the previous appeal we had no idea that we were passing on the tenure of the office. We affirmed a judgment holding that appellant had been improperly removed and ordering his reinstatement. How long appellant should retain his office after reinstatement was quite another question. When the Supreme Court of Puerto Rico, upon remand from us, regained jurisdiction over its judgment of June 28, 1940, a new situation was then presented. It was then inappropriate, if appellant's term of office had meanwhile expired, for the Supreme Court of Puerto Rico to carry into execution its decree of reinstatement.

This brings us to the merits, the question whether under the applicable statute the city manager holds office for a life tenure (during good behavior), or as contended by the Board, for a definite term of four years coincident with the four-year terms of the members of the Board which appointed him.

Act No. 99 of the insular legislature approved May 15, 1931, established a special government for the body politic to be known as the "Capital of Puerto Rico". Relevant portions of this Act, Laws P. R. (1931) p. 626, and of amendatory Act No. 10, Laws P. R. (1937) p. 131, are copied in the footnote.[1]

[1] Act No. 99:

"Section 9.—The legislative powers conferred by this Act on the Capital shall be exercised by a governmental body which shall be officially known as 'Board of Commissioners of San Juan.' This Board of Commissioners shall be composed of five members, who shall be appointed by the Governor of Porto

Rico, with the advice and consent of the Insular Senate, for the following terms:

One Commissioner for a term of one year;

One Commissioner for a term of two years;

One Commissioner for a term of three years;

The legislative powers are conferred upon a governmental body known as the "Board of Commissioners of San Juan". As originally constituted by § 9 of the Act,

One Commissioner for a term of four years;

One Commissioner for a term of five years.

"None of the first five commissioners appointed in accordance with this Act shall assume his office until his appointment has been confirmed by the Insular Senate.

"Section 10.—There are also hereby created the offices of City Manager, Treasurer, Director of Public Works, Director of Health and Charities, School Director, Auditor and Secretary of the Capital.

"Section 21.—The City Manager shall be the chief executive of the Capital; he shall be appointed by the Board of Commissioners created by this Act and shall hold office during good conduct.

"Section 22.—The City Manager may be removed by the Board of Commissioners, for just cause, upon hearing and an opportunity to defend himself either in person or through attorneys. The following shall be causes for the removal of the City Manager: Any act of his constituting a felony; any act of his constituting a misdemeanor and implying moral turpitude; or carelessness, inexcusable negligence in the performance of his duties, or immoral or incorrect conduct in the exercise thereof.

"Section 26.—The City Manager shall appoint the following officers:

(1) Treasurer of the Capital;

(2) Director of Public Works;

(3) Director of Health and Charities;

(4) School Director;

(5) Secretary of the Capital.

"Section 27.—The Treasurer, the Director of Public Works, the Director of Health and Charities, the School Director, and the Secretary of the Capital may be removed by the City Manager, for just cause, upon hearing and an opportunity to defend themselves either in person or through attorneys. The following shall be causes for the removal of said officers: Any act of theirs constituting a felony; any act of theirs constituting a misdemeanor and implying moral turpitude; carelessness, or inexcusable ignorance in the performance of their duties, or immoral or incorrect conduct in the exercise thereof.

"Section 36.—The Auditor of the Capital shall be appointed by the Board of Commissioners. This official may be removed by the Board of Commissioners for just cause, after a hearing and an opportunity to defend himself either personally or by attorneys. Causes for removal of this official shall be any act performed by him which constitutes a felony; any act performed by him which constitutes a misdemeanor and implies moral turpitude; carelessness or inexcusable negligence, or immoral and incorrect conduct, in the discharge of his office.

\* \* \* \* , \* \*

"Section 39.—All appointments of employees shall be made by the respective officers, according to the department of the Capital in which they render services. Said employees shall be appointed for the term for which each officer is appointed. The employees of the Capital may be removed for just cause by the officer appointing them, after a hearing and an opportunity to defend themselves. Any employee may be suspended from office and salary upon the preferment of charges against him by the corresponding official.

"Section 50.—The Board of Commissioners created by this Act shall be elected by popular vote at the general elections to be held in 1936, and every four years thereafter. The Commissioners appointed by the Governor of Porto Rico in accordance with section 9 of this Act shall hold office until the first Monday in January of 1937."

Amendatory Act No. 10:

"Section 1.—Section 50 of Act No. 99, entitled 'An Act to establish a special government for the Capital of Puerto Rico, and for other purposes', approved May 15, 1931, as subsequently amended, is hereby amended to read as follows:

"'Section 50.—The Board of Commissioners created by this Act shall be composed of nine members. Five of these nine members shall be elected by the popular vote of the qualified voters of both precincts of San Juan at the general elections to be held in 1940 and each succeeding four years. The other four members shall be appointed by the Governor of Puerto Rico with the advice and consent of the Insular Senate. The nine members of the Board of Commissioners shall take office on the second Monday in February following each general election; Provided, That the five members of the Board of Commissioners elected at the general election of 1936 shall continue in office until the end of the terms for which they were elected, and said Board of Commissioners shall be increased in the manner indicated as soon as this Act takes effect.

\* \* \*'

\* \* \* \* \* \* \*".

this was a continuing body, composed of five commissioners, appointed by the Governor and confirmed by the Senate, with staggered terms, the term of one commissioner expiring each year. Section 50 of the Act, however, provided that at the general elections in 1936 and every four years thereafter the commissioners should be elected by popular vote, the commissioners previously appointed by the Governor under § 9 to hold office until the first Monday in January, 1937. Act No. 10, approved March 24, 1937, increased the membership of the Board by providing that the Governor should forthwith appoint, with the advice and counsel of the Senate, four additional commissioners to serve with the five commissioners who had been elected in 1936. For the future it was provided that the nine members of the Board should take office on the second Monday in February following each general election, which seems to imply that the four appointed commissioners are to hold office for four years, as in the case of those elected by popular vote.

Section 10 creates the offices of city manager, treasurer, director of public works, director of health and charities, school director, auditor and secretary of the Capital.

Section 21 provides that the city manager shall be the chief executive of the Capital; "he shall be appointed by the Board of Commissioners created by this Act *and shall hold office during good conduct."* [Italics ours.] Procedure for removal of the city manager by the Board "for just cause" after hearing is set forth in § 22.

Section 26 provides that the city manager shall appoint the various departmental heads previously mentioned, except the auditor. No specific provision is made as to the tenure of these officers so appointed by the city manager, but § 27 provides that they may be removed by the city manager, for just cause after hearing, the removal provisions being the same as those empowering the Board to remove the city manager.

Section 36 provides that the auditor shall be appointed by the Board of Commissioners. No specific provision is made as to the auditor's term of office; but he also may be removed by the Board for just cause after hearing.

It is to be observed that the legislature has dealt in various ways with the tenure of officers and employees of the city government. The commissioners have fixed terms of years. Of the two officers to be appointed by the Board, the city manager "shall hold office during good conduct"; the auditor's tenure is not stated. Nor is any tenure stated for the other offices to which the city manager has the appointing power. "Employees" are appointed for the term of the appointing officer.

Act No. 99 supersedes, so far as concerns the capital city, the Municipal Law of April 28, 1928, Laws, P.R. (1928) No. 53, p. 334, under whch the chief executive was a mayor, elected for a fixed term, though subject to impeachment by the municipal assembly. Appellant contends that the legislature, in providing that the city manager should hold office "during good conduct," evidenced a clear and unambiguous purpose to introduce experimentally in the city of San Juan a new type of city government, under which the chief executive or city manager would hold office during good behavior "without being tied to the whims and uncertainties of partisan politics."

The court below, however, reached the conclusion that "the tenure of office of the city·manager of the capital is that of four years, provided that during the same he observe good behavior."

It is difficult for us to see how § 21 could mean anything different in 1937, and thereafter, from what it meant in 1931, when the new form of government was instituted. There is no basis for saying that the first city manager, appointed in 1931, held a four year term, for at that time the tenure of office of the commissioners themselves was not four years, and their terms were staggered so that only one of the five commissioners went out of office each year.

But passing that difficulty, suppose it had been provided from the outset that the whole body of commissioners should be elected by popular vote every four years, as § 50 provided for 1936 and thereafter. It might then be implied that the auditor, whose tenure is not specifically stated, holds office during a four year term, coinciding with that of the commissioners. The only other alternative would be (1) that the auditor holds office at the pleasure of the Board, which would seem to be contrary to the implication of the further provision that the auditor is removable by the Board for just cause, after notice and

hearing,[2] or (2) that the auditor holds office for life, subject to removal for cause. But a life tenure for public officers is the exceptional thing and will not be read into the statute by implication. Shurtleff v. United States, 1903, 189 U.S. 311, 316, 23 S.Ct. 535, 47 L.Ed. 828. Notwithstanding the provision that the city manager shall hold office "during good conduct," the court below has read the statute as meaning that the city manager has the same limited tenure as that of the auditor, as to whose tenure the legislature is silent. Under this interpretation the phrase "during good conduct" in § 21 seems to be rendered meaningless and of no significance.

The tenure of federal judges under Article III, § 1 of the Constitution is described as "during good Behavior," which means for life, provided they behave themselves. Cf. Matter of Hennen, 1839, 13 Pet. 230, 258, 10 L.Ed. 138. Nobody ever supposed that "during good behavior" meant that the judge would hold office during the term of the president who appointed him, provided that he observed good behavior during that time. In Smith v. Bryan, 1902, 100 Va. 199, 203, 40 S.E. 652, 653, cited by the court below in another connection, it is stated: "An official tenure 'during good behavior' is for life, unless sooner determined for cause. And removal for cause implies a right to be heard, and a trial in one form of procedure or another."

The steps in the reasoning of the court below are as follows:

(1) Life tenure for public officers is the exception; hence should not be read into the statute by implication but only if the intention of the legislature to that effect appears to be so evident as to permit of no doubt. This is an accepted canon of construction, for which the court properly cites Shurtleff v. United States, 1903, 189 U.S. 311, 23 S.Ct. 535, 47 L.Ed. 828. That case involved the tenure of the office of general appraiser of merchandise. It was provided in the act creating the office that the appraisers should be appointed by the President with the advice and consent of the Senate and might be removed from office at any time by the President for in-

efficiency, neglect of duty or malfeasance in office. Beyond that the statute was silent as to the tenure of the office. The court held that Congress had not clearly enough indicated an intention to make the tenure one for life subject only to removal for cause; and therefore that the act should be construed as leaving unrestricted the President's implied power of removal without cause. But the significant thing is that the act there involved did not provide that appraisers should hold office "during good behavior". The court pointed out (page 316 of 189 U.S., page 536 of 23 S.Ct., 47 L.Ed. 828) that "The tenure of the judicial officers of the United States is provided for by the Constitution; but, with that exception, no civil officer has ever held office by a life tenure since the foundation of the government". How is the life tenure of judicial officers provided for in the Constitution except by the phrase that they shall hold office "during good Behavior"? The rule of interpretation laid down in the Shurtleff case, where the act in question did not use the phrase "during good Behavior", should not be used to create an ambiguity in § 21 of the act now before us, where the legislature describes the tenure simply as "during good conduct".

(2) The court points to the "anomaly" which would result if the city manager were held to have a life tenure, from the fact that the treasurer, the director of public works, etc., might under § 26 be appointed "for a limited term to be fixed by the city manager," while an employee attached to the office of the city manager, "for example, the messenger of his office, by the mere fact of being appointed by the city manager would hold his employment for life unless removed for just cause." Along the same line, the court states that an uncalled for discrimination would be created between the employees appointed by the other officers and the employees appointed by the city manager, "as the former would hold their employments during the tenure of the appointing officer while the term of office of the employees appointed by the city manager would be for life."[3] But these "anomalies," if such

---

[2] See People of Puerto Rico ex rel. Luis A. Castro, — P.R.R. —, decided by the Supreme Court of Puerto Rico July 29, 1942.

[3] Whose "life"? Presumably not that of the employee, for the idea in § 39 seems to be that the employee holds office during the tenure of the officer who appointed him. If appellant is correct, the tenure of the city manager is for life unless sooner terminated by his resignation or removal for cause.

they be, are relevant only if it is assumed that there is doubt or ambiguity as to the meaning of § 21.

(3) The court invokes the rule of construction that where the legal provision describing a term is uncertain or doubtful, an interpretation will be adopted which limits the term to the shortest time—in this case, "that of four years, which is the one of the majority, at least, of the Board of Commissioners which appointed" the city manager. This, again, assumes some ambiguity in § 21.

▋ (4) The court refers to the rule that in cases of doubt "the practical construction given to a statute by public officials and acted upon by the people" will be regarded as decisive. In this connection the court took judicial notice of the facts that at the general elections held in 1936 and 1940 the various political parties had indicated to the electorate in advance their respective choices for city manager, and that when the newly elected commissioners took office the board proceeded to appoint as city manager the candidate of the successful political party. Appellant objects that the court below ought not to have taken judicial notice of these facts; that he had no opportunity to put in evidence other facts or explanations which would rob the judicially noticed facts of their

significance, and thereby he was denied due process of law. But it is clear that an appellate court may take judicial notice of public acts and facts of common knowledge bearing on a doubtful issue of statutory construction. If the court below took judicial notice of some fact that wasn't so, appellant, on appeal to us, by reference to official records or in some other appropriate way, could bring the true situation to our notice, and we in our turn, taking judicial notice of the relevant facts, could review any error in statutory interpretation committed by the court below as the result of a misapprehension of the facts judicially noticed by it. Appellant, however, has not undertaken to enlighten us on these matters. Indeed, appellant does not deny the fact, as stated by the court below, that appellant. himself was the preannounced choice for city manager of the winning party at the general elections of 1936. And there seems to be no doubt of the further fact, stated by the court below, that when the newly elected commissioners came into office on January 4, 1937, they proceeded at once to appoint appellant as city manager.[4]

▋ Appellant is no doubt embarrassed by the argument ad hominem, namely, that appellant himself obtained the office of city manager upon an assertion of an interpretation of § 21 inconsistent with that

---

[4] In his opposition to the motion of the Board for stay of execution of the judgment insofar as it ordered reinstatement, filed in the court below, appellant, referring to the tenure of his predecessor in the office, said: "The fact remains that Mr. Benítez Castano did not cease in the exercise of his office because a part of the Board of Commissioners was again elected in 1936, but because of his voluntary resignation, effective many months after January, 1937." But we note that in appellant's original petition in the District Court of San Juan, seeking review of the Board's order of removal, appellant recites that he "held the public office of City Manager, appointed therefor by the respondent Board on the 4th of January 1937." In the complaining petition filed before the Board, seeking removal of appellant, it is recited: "The respondent, Carlos M. de Castro is and has been at all times stated in this petition City Manager having been appointed by the Board of Commissioners of the Capital for that office during good conduct, in the month of January 1937, the said

Carlos M. de Castro having taken possession of said office on the 4th day of January 1937 temporarily and on the 19th day of March 1937, as proprietor." Appellant's answer, referring to this paragraph in the complaint, states: "He admits that he is City Manager, appointed by the Board of Commissioners of San Juan and has been in the discharge of his present office from the 4th day of January 1937 up to the present time." In the court's opinion in Rodriguez v. de Castro, 1937, 52 P.R.R. 275, 277, there is quoted a letter written by appellant stating that Mr. Jesús Benítez Castaño "ceased to be City Manager of the Capital on the 19th of March, 1937." It may be surmised from all this that the newly elected board coming into office on January 4, 1937, asserted on that day its power to appoint, and did appoint, appellant as city manager, but that the incumbent, Mr. Benítez Castaño, at ·first demurred, perhaps making the claim which appellant now makes on this appeal, that the city manager holds office "during good conduct".

which he now maintains. But we know of no principle of "estoppel" which would preclude appellant from taking this inconsistent position in the present proceedings.

■ The interpretation put upon the Act by the local political parties and by the successive boards of commissioners would be a relevant consideration in determining the construction of the Act, if the Act itself is deemed to be doubtful or ambiguous in meaning.

■ If we were free to take a wholly independent view of the point at issue we would be inclined to conclude that the meaning of § 21 is clear, and that the court below went beyond the permissible limits of interpretation in reading the clause "and shall hold office during good conduct" as meaning that "the tenure of office of the city manager of the capital is that of four years, provided that during the same he observe good behavior." But in Sancho Bonet v. Texas Co., 1940, 308 U.S. 463, 471, 60 S.Ct. 349, 353, 84 L.Ed. 401, the court said: "To reverse a judgment of a Puerto Rican tribunal on such a local matter as the interpretation of an act of the local legislature, it would not be sufficient if we or the Circuit Court of Appeals merely disagreed with that interpretation. Nor would it be enough that the Puerto Rican tribunal chose what might seem, on appeal, to be the less reasonable of two possible interpretations. And such judgment of reversal would not be sustained here even though we felt that of several possible interpretations that of the Circuit Court of Appeals was the most reasonable one. For to justify reversal in such cases, the error must be clear or manifest; the interpretation must be inescapably wrong; the decision must be patently erroneous."

■ We are not prepared to say that the judgment now under review is "inescapably wrong." For many years this court has not had much luck in reversing the Supreme Court of Puerto Rico on questions of local law. As we pointed out in de La Torre v. National City Bank, 1940, 110 F.2d 976, 983, "though Congress has given us appellate jurisdiction over the Supreme Court of Puerto Rico in matters of local law where the value in controversy exceeds $5,000, the exercise of this jurisdiction is so restricted by the canon prescribed by the Supreme Court of the United States that appeals in such cases are likely to be futile and merely to cause needless delay and expense."

It may be pointed out that our function in this class of cases, technically, at least, is different from that of the Supreme Court of the United States upon review of decisions of state courts. There, the Supreme Court has no appellate jurisdiction in matters of state law, and hence it accepts as conclusive the decisions of the state tribunals in matters of local law. But Congress has given us, and the Supreme Court of the United States upon certiorari, appellate jurisdiction over the Supreme Court of Puerto Rico in matters of local law where the jurisdictional amount is involved. It may well be that as a matter of legislative policy we ought not to have this jurisdiction; the present case is a good example, involving as it does a political matter of strictly local concern in San Juan, Puerto Rico. But as the law now stands litigants bring these cases to us as a matter of right, and we have to pass on them. It is a bit humiliating to this court to be obliged to act practically as a rubber stamp, or else to be reversed by the Supreme Court of the United States.

Incidentally, we have two lines of appellate jurisdiction from Puerto Rico, one from the United States District Court for Puerto Rico and the other from the Supreme Court of Puerto Rico. 28 U.S.C.A. § 225. Appeals from the District Court may involve questions of local Puerto Rican law; so far as we know, the "inescapably wrong" rule has never been applied in such cases. Suppose, upon such an appeal, we should decide a question of local law which had never been passed upon by the Supreme Court of Puerto Rico, and that subsequently, in other litigation, the same question should come before that court. Would it be "inescapably wrong" if it should refuse to follow our previous ruling on the point? Or is the Supreme Court of Puerto Rico free in such a case to make its own interpretation of the local law, brushing aside an earlier decision of this court, which on the face of 28 U.S.C.A. § 225 has appellate jurisdiction over it?

We have gone into this case at such length not in any spirit of complaint, because we recognize that the Supreme Court of the United States applies to itself the same self-denying canon which it imposes on us; and it may be a good thing. But to save future litigants from disappoint-

ment and futile expense, we wish to reiterate that our appellate jurisdiction in this class of cases is pretty much of a dead letter.

The judgment of the Supreme Court of Puerto Rico is affirmed, with costs to the appellee.

